1
2
3
4
5
6
7
8
9
10
11
12
13
14

## UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| KIM LOWERS, | No. 1:04-cv-6675-AWI- TAG |
| Plaintiff, | REPORT AND RECOMMENDATION ON PLAINTIFF'S APPEAL FROM ADMINISTRATIVE DECISION |
| vs. | |
| MICHAEL J. ASTRUE, Commissioner of Social Security,[1] | REPORT AND RECOMMENDATION TO REMAND CASE PURSUANT TO SENTENCE FOUR OF 42 U.S.C. § 405(g) |
| Defendant. | |
| _____/ | REPORT AND RECOMMENDATION TO ENTER JUDGMENT FOR PLAINTIFF AND AGAINST DEFENDANT |

## INTRODUCTION

Plaintiff Kim Lowers ("Claimant") seeks judicial review of an administrative decision denying her claim for Supplemental Security Income ("SSI") benefits due to her disabilities, pursuant to Title XVI of the Social Security Act ("the Act"), 42 U.S.C. § 1381 et seq. Pending before the Court is Claimant's appeal from the administrative decision of the Commissioner of Social Security ("Commissioner"). Claimant filed her complaint on December 9, 2004, and her opening brief on August 6, 2005. (Docs. 1, 13). On August 11, 2005, this Court ordered Claimant to file an amended opening brief because her original brief did not comply with the requirements set forth in the Court's scheduling order. (Doc. 14). Claimant filed a new opening brief on September 10, 2005. (Doc. 15). The Commissioner filed an opposition to the appeal on December 9, 2005. (Doc. 20). Claimant did not file a reply brief.

---

[1] Michael J. Astrue is substituted for his predecessor, Jo Anne B. Barnhart, as Commissioner of the Social Security Administration. 42 U.S.C. § 405(g); Fed. R. Civ. P. 25(d)(1).

1

1

## JURISDICTION

2       On November 13, 2002, Claimant protectively filed[2] a "leads/worksheet" for SSI under

3   Title XVI of the Act.  (Administrative Record ("AR") 68).  She filed her application for SSI on

4   November 25, 2002.  (AR 69-71).  Claimant's application was denied initially and on

5   reconsideration.  (AR 48-51, 55-58).

6       After timely requesting a hearing, Claimant and her counsel appeared before

7   Administrative Law Judge ("ALJ") James N. Baker on October 17, 2003.  (AR 31-45).  On

8   December 17, 2003, the ALJ issued a written decision finding that Claimant was not disabled

9   and, therefore, not eligible for SSI.  (AR 14-28).  The Appeals Council denied Claimant's request

10  for review on October 21, 2004.  (AR 6-8).  The Appeal Council's decision, therefore, became

11  the final decision of the Commissioner, which is appealable to the district court pursuant to

12  42 U.S.C. § 405(g).  The initiation of an appeal in the district court must be commenced within

13  sixty (60) days of the Appeal Council's decision.  42 U.S.C. § 405(g).  On  December 9, 2004,

14  Claimant timely filed this action.  (Doc. 1).

15

## STATEMENT OF FACTS

16      In her November 2002 application for SSI, Claimant alleged that she was incapable of

17  working because she had Hepatitis C, which causes her fatigue and nausea, and an unspecified

18  thyroid disorder.  (AR 75).  She noted that her disability onset date was January 1, 2000, but

19  added that she continued to work part-time until August 10, 2002.  (AR 68-69, 75).

20      Claimant testified that she was born on August 2, 1962, making her 41 years old at the

21  time of ALJ Baker's decision.  (AR 34).  Claimant stated that she attended school through the

22  tenth grade and that she last worked in 2000.  (AR 35).  Claimant testified that she can no longer

23  work due to her Hepatitis C, which leaves her extremely fatigued, and that she sees a

24  psychologist for her depression and anxiety, which makes it difficult for her to leave her home.

25  (Id.).  When asked about her Hepatitis C, Claimant testified that she was aware that it responds

26

27          [2]  To qualify as an effective SSI claim, an application for benefits must be submitted on a prescribed form.
28  20 C.F.R. § 416.305.  However, a written statement indicating a person's intent to claim benefits can, if certain
    coincident and subsequent requirements are met, establish a protective filing date.  20 C.F.R. § 416.340.

positively to a regimen of interferon, and that a failure to treat could allow her disease to worsen,

but that she had declined to take any such treatment because of a fear of doing so:

| | | |
|---|---|---|
| ALJ: | Has that [Hepatitis C treatment program] every been rescheduled or anything of that ilk? | |
| Claimant: | No. | |
| ALJ: | Why not? | |
| Claimant: | Truthfully, Your Honor, I'm really afraid of doing this interferon, and I know I have to do it. | |
| ALJ: | Well, what have the doctors told you? | |
| Claimant: | They said the type that I have, hepatitis C, responds to it, to the interferon and I have to give myself my own injections, and I just -- | |
| ALJ: | More important, what have the doctors told you if you don't undergo the treatment? | |
| Claimant: | That it could get worse to where the treatment won't help me. | |
| ALJ: | So you're aware then that if you don't undergo the treatment, you're going down a real slippery slope.  You understand that? | |
| Claimant: | Yeah, I do. | |

. . .

| | |
|---|---|
| ALJ: | And I assume the doctors told you that this interferon ribavarin, which is the current approach to this particular disease, is pretty uncomfortable, but I'm also sure they told you that it's not as uncomfortable as what could happen if you don't undergo the treatment. |
| Claimant: | Right. |
| ALJ: | Is that correct? |
| Claimant: | Yeah. |

(AR 41-42).

Claimant testified that, in the past three (3) to eight (8) months, she became anemic but, because of her Hepatis C, could not take iron, has suffered lower-back pain that prevents her from sitting or driving for long periods of time, neck and knee pain, and chronic headaches, including migraines.  (AR 38-40).

Regarding her daily life activities, Claimant testified that she has two daughters, ages 7 and 18, and that she fixes breakfast and lunch for her younger child before driving her to school

in the morning.  (AR 35-36).  Claimant further stated that, after returning home in the morning, she vacuums the house or does laundry, watches television, takes a nap, changes the sheets or does some other housework, takes an afternoon nap, picks her younger daughter up from school and prepares a simple dinner for her, and watches some more television.  (AR 36-38).  Claimant testified that she watches a total of three (3) hours of television daily and goes shopping twice weekly.  (AR 35, 38).  According to Claimant, she has no active hobbies, does not read due to poor concentration, and frequently forgets things, such as recent conversations with her older daughter and whether she paid the bills or took her medication.  (AR 37-38).  She added that she has gone to the movies, but not recently.  (AR 38).

**Claimant's Medical Records**

According to Lowers' medical records, which clearly are incomplete and many of which are illegible, she was treated by F.N.P. Candace Heron ("FNP Heron"), various Physicans Assistants ("PA"), Dr. R. Byron Palmer, M.D., at Greenley Primary Care Center ("Greenley"), Dr. Henry W. Kao; and Tuolumne General Hospital ("TGH") and Tuolumne Indian Health Center ("TIHC"), which appear to be affiliated.  (See generally AR).

On March 12, 2001, Claimant had an appointment with FNP Heron at Greenley after suffering a sinus infection, bronchitis, and bilateral otitis media (ear-aches).  FNP Heron noted that Claimant's past medical history included Hepatitis C, mild anemia, post-ablation of thyroid following Graves disease (an autoimmune disease that can affect, inter alia, the thyroid, in 1992, and depression and anxiety, which appeared to be were situational.  After examining Claimant, FNP Heron reported that, although Claimant's completed forms indicated that she was extremely depressed and moderately anxious, she effectively managed her life.  FNP Heron further assessed that Claimant might need a lower dosage of her hypothyroid medication (Levothyroid) and expressed an interest in psychotropic medication and therapy.  Claimant was given prescriptions for Claritin, Aciphex, and Guaifenesin syrup to help alleviate her irritable stomach and thick mucus.  Dr. Palmer reviewed and approved this assessment and plan.  (AR 287-288).

Between April 3 and December 28, 2001, Claimant went to Greenley to see FNP Heron and/or Dr. Palmer eight times.  (AR 273-286).   She initially complained of diarrhea, palpitations,

shortness of breath, fatigue, and tremors.  Dr. Palmer adjusted the dosage of Claimant's thyroid medicine. (AR 286).  Claimant had a follow-up visit in early May 2001 and complained that her bowel movements did not appear normal after she took Immodium, then laxatives, and she had cramps in her diaphragm.  Claimant added that she had headaches. Dr. Palmer noted that Claimant had a history of gallstones and diarrhea alternating with constipation, and ordered various lab tests. (AR 185).  On May 23, 2001, Claimant presented complaining that she was congested and coughing up green mucus.  An examination revealed that her nose was inflamed and she had pain when pressure was exerted on her sinuses.  Claimant was provided with written information regarding Hepatitis C, sinusitis, and several prescriptions.  It was indicated that she would see Dr.  Smith pre-op, although no further information about an operation was noted.  (AR 284).  In September, Claimant reported that she felt better since she had been taking Celexa (an anti-depressant), but she was worried about a lump on her head.  She was told to continue taking the medications, to wait and see if the lump changed, and to continue physical therapy for her pain. (AR 282-283).  In November, Claimant complained of increased stress, nausea, fatigue, and reported that soon would have gallstone surgery.  (AR 277).  Claimant saw FNP Heron later in 2001, complaining that she had not felt well for a few weeks; specifically, she reported fatigue and increased stress, but stated that her back pain had decreased since she had started doing exercises.  Claimant was told to continue doing her low back exercises but stop taking Vicodin and take only Motrin for any back pain.  (AR 273).

On January 14, 2002, Claimant called Greenley complaining of severe back pain that Motrin and hot or cold compresses did not alleviate.  She added that the pharmacy would not refill her Vicodin.  Claimant was told that they were waiting for her x-ray results. (AR 271).  On January 15, 2002, Claimant left a message advising the doctor that she had her x-rays taken that morning.  Her call was returned with the x-ray results on January 16.  It is not clear whether the pharmacy was called with an order to refill the Vicodin.  (AR 270-271).  On an illegible date, Claimant presented to the doctor complaining of right lower back pain with tingling in her right foot and anxiety.  An examination of Claimant's mobility confirmed that she suffered back problems.  Claimant was prescribed Vicodin and a beta-blocker for her high blood pressure.  She

refused to attend physical therapy or see a chiropractor.  (AR 269).

On February 21, 2002, Claimant had her second appointment with FNP Diane Conklin at TIHC.  According to Claimant, she changed providers because her previous one had continuously prescribed medications for ailments, such as hypertension, that she did not believe she had. Claimant reported that she had a history of gallstones, for which surgery was recommended, but acknowledged that she had never followed up on the recommendation.  Claimant complained of pain in her left upper arm.  FNP Conklin thought that Claimant's pain could be referred pain from her gallbladder and prescribed Vioxx.  (AR 170).

Claimant presented at TIHC on March 27, 2002, complaining that she almost fainted four days earlier.  She reported that she had a migraine headache "a couple of days before," and took Advil, which generally alleviated her headaches.  Claimant further stated that she was depressed, with concomitant symptoms of, inter alia, lack of concentration, crying spells, and increased sleep.  FNP Conklin noted that Claimant's daughter was hospitalized, causing Claimant situational distress.  FNP Conklin noted Claimant's history of Hepatitis C and reiterated that she had yet to have surgery for her gallstones.  She observed that Claimant had quite a bit of fluid in her ears, but no sign of infection.  Claimant's diagnoses included depression, allergic rhinitis, and, based only on her reported history, Hepatitis C.  FNP Conklin prescribed Zyrtec (allergy medication) and an inhaler, and ordered lab work, after which Claimant should return and they could discuss treatment for her other complaints.  (AR 168-169).

On April 3, 2002, Claimant returned to TIHC, reported that she had not had the lab work done or picked up the prescriptions.  She complained of severe left ear pain with shooting pains toward her neck and throat and a cough with green phlegm.  FNP Conklin diagnosed left and right otitis (ear infections) and acute sinusitis, prescribed Bactrim (antibiotic) and a liquid antibiotic to suspend in her ear canal, Zyrtec, Nasacort, and Vicodin to take at bedtime for the pain.  (AR 167).  Claimant had the ordered lab work performed on April 10.  (AR 164-166; see infra p. 7).

On April 11, 2002, Claimant presented to FNP Conklin complaining that she still had a cough and suffered from a congested chest, sore throat, fatigue, and difficulty sleeping at night

due to feeling as though she was suffocating.  FNP Conklin diagnosed her with bilateral otitis

media (infection or inflammation of the middle ear), otalgia (earache), and a sleep disorder, and

referred her to an ENT specialist, scheduled an overnight sleep study with oximetry to determine

if she had sleep apnea, and advised her to continue taking Zyrtec, using a nasal spray, and to start

using Breathe-Right nasal strips overnight.  (AR 163).

On August 15, 2002, Claimant saw PA Gann-LaTorre at TIHC, complaining of a two-

month history of bilateral ear pain, which had started radiating down her neck.  The PA

concluded that Claimant had bilateral otitis media, eustachian tube dysfunction, and possible

TMJ.  She prescribed a Z-Pak, told Claimant to being using Zyrtec and Nasacort again, ordered a

CT scan of her head that would include her sinuses and eustachian tubes, and get a bite block to

wear at night.  (AR 158).  Claimant's CT scan revealed that she had normal paranasal sinuses,

but that no scan of her or eustachian tubes was performed.  (AR 156).

Also on August 15, Claimant had an appointment with a PA at Greenley.  Claimant

reported that she frequently woke up with a right-sided unilateral headache, coupled with nausea.

The assessment was that Claimant's headaches either were caused by muscle contractions or

were sinus-related and the PA ordered x-rays and lab work.  The PA prescribed ibuprofen as

needed for pain, told Claimant to continue taking Allegra (an antihistamine and decongestant)

and Flonase (corticosteroid nasal spray), and to follow up in two weeks.  (AR 267).  On

September 3, 2002, Claimant presented at Greenley complaining of persistent headaches.

Medication was prescribed but discontinued the following day after she suffered an allergic

reaction to it. (AR 261).

On September 17, 2002, Claimant saw PA Gann-LaTorre at TIHC "TIHC PA").

(AR 155).  The TIHC PA noted that Claimant's care had been transferred from Dr. Palmer's FNP

to her due to the August 10, 2002, results from lab tests ordered by Dr. Palmer's PA, which

confirmed that she had Hepatitis C with an increased viral load.  Dr. Palmer also referred

Claimant to Dr. Henry Kao, a gastroenterologist.  (AR 262-264).  The TIHC PA reported that

Claimant stated that she wanted to withdraw from what she believed was her addiction to

Vicodin, which made her depressed and anxious, and she wanted to do whatever was best for her

liver and general health.  (AR 155).

Claimant kept her October 16, 2002, appointment with gastroenterologist Henry W. Kao. Dr. Kao noted that Claimant had not had a liver biopsy.  Claimant reported a history of thyroid disease, nausea, indigestion, and anemia.  Dr. Kao's diagnosis was that Claimant had chronic Hepatitis C.  He explained and provided Claimant a brochure about the proposed procedure, which is not specified in his report.  Dr. Kao also referred Claimant to another specialist to have her gall bladder removed.  (AR 120-121, 291).

On October 17, 2002, Claimant saw the TIHC PA and requested a complete physical. The PA noted that Dr. Kao's FNP had recommended that Claimant undergo pegylated interferon and ribavirin treatment (the "treatment") for her Hepatitis C, further adding that she did not need a biopsy because she had Type 2 Hepatitis.  Claimant reported that, because she had become extremely fatigued and suffered nausea with intermittent vomiting. she was considering the treatment.  The TIHC PA noted that Claimant suffered from hypothyroidism, for which she was prescribed medication, in addition to Hepatitis C, and noted that felt much better since she had stopped taking Vicodin.  (AR 149).  Claimant had completed high school and was a divorced mother of two daughters – aged 6 and 17.  The TIHC PA noted that Claimant had not worked for three years due to her extreme fatigue, which likely was secondary to her Hepatitis C.  In addition, she smoked cigarettes for twenty-four years.  Claimant reported that she (1) felt feverish in the morning for the past couple of months; (2) has right-ear pain that is likely caused by TMJ, but for which she will undergo an MRI; (3) suffers pain in her right shoulder and neck caused by muscle tightness; (4) denies shortness of breath, coughing, or asthma, despite her smoking; (5) has had frequent nausea, occasional vomiting and heartburn, and alternating constipation and diarrhea; and (6) denies being depressed but is "bummed" due to her Hepatitis C and lack of energy.  (AR 150-151).  Following a physical examination, the TIHC PA's impression was that Claimant suffered from Hepatitis C, GERD, irritable bowel syndrom, and arthralgia.  She ordered (1) an ultrasound of the liver and gallbladder; (2) prescribed Nexium; (3) encouraged Claimant to increased the fiber in her diet; and ordered (4) various tests and labs, noting that Claimant refused a flu vaccination, and, because she had no antibodies to Hepatitis B, she would get her first

8

1   injection of her Hepatitis B series that day.  (AR 151-152).

2       On November 6, 2002, Claimant underwent an abdominal ultrasound and a pelvic

3   sonogram.  The medical imaging report from these tests indicated that Claimant had

4   cholelithiasis (gallstones), but an otherwise normal gallbladder.  In addition, Claimant's right

5   ovary was enlarged, which could be due to a simple or complicated cyst or a tuboovarian abscess.

6   (AR 143-144).

7       On November 14, 2002, Claimant called the TIHC PA and asked if she should go to the

8   emergency room, but was advised to come to the clinic instead.  When she arrived, she reported

9   that, on November 10, she went to the emergency room and left with a diagnosis of bronchitis.

10  The TIHC PA examined her and concluded that she had a flu-type upper respiratory infection

11  with eustachian tube dysfunction.  Claimant was offered a shot of Toradol (non-steroidal anti-

12  inflammatory) for her general aches and prescribed Allegra D (antihistamine and decongestant),

13  Robitussin DM (for a cough with phlegm), and instructed her to start using her Proventil inhaler

14  again (a bronchodilator prescribed to treat or prevent symptoms associated with asthma and other

15  breathing conditions).  (AR 141).

16      Claimant saw the TIHC PA on November 21, 2002, complaining that "she just does not

17  feel right," and acknowledging that it was likely due to her depression.  (AR 140).  Claimant

18  denied suicidal ideation, but felt like staying in bed.  She reported that she had tried many

19  antidepressants in the past, but they had not been effective.  Claimant stated that she still was

20  considering whether or not to have the interferon treatment for her Hepatitis C, and, knowing that

21  the treatment could worsen her depression, would prefer to have the latter under control before

22  deciding whether to go through with the treatment.  The PA prescribed Doxepin for Claimant's

23  depression and ordered her to return to counseling.  She noted that Claimant would decide what

24  to do about her Hepatitis C after she finished researching the interferon treatment.  (AR 140).

25      On December 2, 2002, Claimant presented at the TGH Emergency Room complaining of

26  severe right knee pain caused when she fell down a stair the previous day.  After x-rays revealed

27  that the knee was normal, a diagnosis of knee strain was made, the knee was immobilized, and

28  Claimant was referred to an orthopedist.  (AR 123-128).

Claimant returned to the TIHC PA on December 12, 2002, complaining that, for approximately two months, she had been suffering intermittent neck pain that radiates down her spine and occasionally down her right shoulder.  The PA observed C4-5 spinal pain with palpitation, muscle tautness and spasms, and some tenderness in the right shoulder.  The PA diagnosed cervical myosotis (inflammation of cervical muscle), for which she prescribed Robaxin (muscle relaxant) and instructed Claimant to perform muscle-stretching exercises and apply ice.  She noted that Claimant still had not decided whether to have the interferon treatment, but reported that she would tell that PA her answer in early 2003.  (AR 139).

On December 19, 2002, Claimant presented at TIHC, complaining of a lump in her stomach and abnormal bowel movements.  The PA found no stomach mass and discussed Claimant's constipation problems.  (AR 138).

A report apparently from TIHC, dated January 3, 2003, and entitled PCC Ambulatory Encounter Record, indicates that Claimant thought that she had a urinary tract infection and was prescribed Septra DS (an antibiotic combination).  (AR 137).

Claimant saw Dr. Palmer on February 19, 2003, both to discuss her lab results and because she wanted cryotherapy for three flaky lesions on her right calf.  Dr. Palmer noted that her medical history included Hepatitis C, anemia, hyperthyroidism[3] post radiation in 1992, hyperlipidemia, depression, anxiety, and cholelithiasis, which was diagnosed in July 2001 but which Claimant had yet to have surgery for it.  Dr. Palmer further reported that Dr. Kao had encouraged Claimant to "undergo treatment" for the Hepatitis C, but she wanted to wait. (AR 254).  Claimant also complained that she felt fatigued and had a general sense of not feeling well.  Dr. Palmer stated that Claimant suffered chronic depression but had not tolerated any of the antidepressants, implying that the problem may be related to her hyperthyroidism. (AR 254-255). Claimant was referred to Dr. Kao for a follow-up visit, told she could take milk thistle, diagnosed with actinic keratoses on her lower right leg for which cryotherapy was

_____

[3]  It is not clear whether Claimant had hyper- or hypothyroidism in light of the fact that her medical records indicate that she continuously was taking medications commonly prescribed for hypothyroidism.  (See, e.g., AR 248, 251, 287-288).

ordered, and diagnosed with hyperlipidemia (high cholesterol), for which no medication was

ordered due to her Hepatitis but a special diet was discussed.  Dr. Palmer noted that he spent

approximately twenty minutes educating and reassuring Claimant and answering her questions.

(AR 255).

Claimant presented at Greenley on March 4 complaining of anxiety due to her Hepatitis C

diagnosis and chronic depression.  She requested antidepressants and reported that she had an

appointment with Dr. Kao on April 22.  (AR 253).  According to Claimant, she now was willing

to undergo treatment involving ribavirin/interferon therapy for her Hepatitis C, which she had

refused in October 2002.  FNP Heron opined that Claimant's decision to undergo treatment may

be a contributing factor to her chronic depression, which first was diagnosed when Claimant was

twelve years old.  (AR 250).  Claimant reported that she had been treated in the emergency room

the previous week for bronchitis and, although most of the symptoms were gone, she still had a

cough that prevented her from sleeping.  (AR 250).  FNP Heron prescribed, with Dr. Palmer's

approval, ibuprofen for chronic back pain, Guaituss AC as needed for her cough, and an AeroBid

inhaler (a corticosteroid used to treat asthma) to use after her Albuterol MDI treatments (generic

substitute for Proventil).  Claimant also was given samples of Effexor, an antidepressant, and

provided with the name of a local counselor to contact for therapy.  (AR 251-252).

On March 11, 2003, Claimant saw FNP Heron and complained that she had had a

coughing attack.  It was noted that Claimant had gone to the emergency room on March 7 for her

cough, and they prescribed a Z-Pak (antibiotics), which she just completed taking.  Claimant

stated that she had not started the Effexor because she did not know whether it would be

contraindicated while she was taking antibiotics.  Claimant brought in a form for Dr. Palmer to

complete and submit, along with a letter on her behalf, to enable her to receive SSI based on her

Hepatitis C, anxiety, and depression.  FNP Heron determined that Claimant had bronchitis with

bronchospasms and prescribed Avelox (antibiotic), Xopenex (a bronchodilator used in lieu of

Albuterol), and other medications to alleviate Claimant's cough and other symptoms.

(AR 248-249).  Claimant was told to start taking the Effexor and, after noting that the chest x-ray

taken in the emergency room indicated some abnormalities, ordered Claimant to get a repeat

11

1    x-ray in one month.  FNP Heron also reminded Claimant to keep her April appointment with Dr.

2    Kao.  Dr. Palmer reviewed and approved the FNP Heron's assessment and plan.  (AR 249).

3          At a March 20, 2003, follow-up visit, Dr. Palmer noted that Claimant had not started

4    taking Effexor and she was very anxious and asked a lot of questions regarding the Hepatitis C

5    treatment.  Dr. Palmer encouraged her to take the Effexor.  (AR 245).  On April 1, Claimant

6    presented complaining of lingering bronchitis.  She stated that, since she had started taking the

7    Effexor, her mood had improved.  Dr. Palmer prescribed a Z-Pak for her bronchitis.  (AR 244).

8          Claimant had her repeat chest x-ray on April 11, 2003.  The radiologist reported that there

9    were no changes from her March 6 x-ray, adding that Claimant had a mild prominence of the

10   hilar structure, which probably was normal for her.  (AR 243).

11         On April 24, 2003, Claimant saw FNP Heron.  Claimant thought that she might have a

12   yeast and a urinary tract infection.  She reported that she saw Dr. Kao on April 22, as scheduled,

13   and planned to start the treatment for Hepatitis C approximately 6 weeks after her gall bladder

14   surgery, adding that she had an appointment with Dr. Hopkins regarding her gall bladder on April

15   25.  (AR 241).  Lab results dated April 22, 2003, indicated that Claimant was reactive for

16   Hepatitis A, AB, and C.  (AR 292).

17         Claimant underwent pre-op tests for gall bladder surgery, which was scheduled to be

18   performed by Dr. Stephen Hopkins on May 8, 2003.  (AR 238-240).  On May 5, Claimant was

19   seen at Greenley and the medical report noted that she was laughing but complained of

20   headaches, which it was thought were caused by anxiety and tension.  (AR 238).  Claimant

21   returned to Greenley on June 5, complaining of respiratory problems and neck spasms.  She was

22   diagnosed as having mild bronchitis and mild right trapezoid muscle spasms and told to apply ice

23   and moist heat, perform exercises, and take prescribed medications.  (AR 237).

24         On June 30, 2003, Claimant presented at Greenley complaining of severe bilateral knee

25   pain and a decrease in the efficacy of the Effexor, which caused a recurrence of her depression.

26   Claimant reported that she planned to start the Hepatitis C treatment two months after she had

27   gall bladder surgery.  The doctor prescribed Lexapro in lieu of Effexor and told Claimant to get

28   x-rays taken of her knees.  (AR 236).  Claimant had a follow-up appointment on July 15, during

1   which she stated that she would not undergo the Hepatitis C treatment until her "SSI was in

2   place." (AR 231).   The medical summary noted that Claimant was anxious about her health and

3   depressed, for which she was in therapy.  It further reported that she complained of fatigue to the

4   extent that she had to take three-to-four naps daily and she continued to suffer knee pain.

5   Claimant repeated her request that the SSI forms and a letter on her behalf be submitted so that

6   she could collect benefits.  (AR 231).  On July 29, 2003, a radiologist reported that Claimant's x-

7   rays revealed no abnormalities in either knee.  (AR 227).

8        During Claimant's August 25, 2003, follow-up appointment at Greenley, she asked that

9   her anti-depressant medication be changed back to Effexor from Lexapro, which request was

10  honored.  Claimant reported that she was afraid of the Hepatitis C treatment and was encouraged

11  to see Dr. Kao on September 8 regarding the treatment.  (AR 223).

12                         **Residual Functional Capacity Assessments**

13  **Physical**

14       On December 17, 2002, a medical consultant prepared a non-examining physical residual

15  functional capacity ("RFC") assessment, in which he concluded that Claimant's only limitations

16  consisted of (1) occasionally lifting and carrying twenty pounds; (2) frequently lifting and

17  carrying ten pounds, (3) standing, sitting, and walking for six hours, with breaks, in an eight hour

18  work day; and (4) occasionally climbing, balancing, stooping, kneeling, crouching, and crawling.

19  The consultant further noted that Claimant's symptoms were attributable to medically

20  determinable impairments.  He also submitted a chronological discussion of evidence and issues,

21  reporting that Claimant's allegations of thyroid problems are refuted by the medical records,

22  which indicate that her thyroid tests are within normal limits.  The consultant acknowledged that

23  Claimant's Hepatitis C viral load was high.  With respect to Claimant's consistent complaints of

24  feeling unwell, the consultant noted that her exams were normal and that she felt much better

25  when she stopped taking Vicodin.  The consultant opined that, physically, Claimant was in the

26  "light RFC" category.  (AR 128-135).

27       Greenley Primary Center FNP Heron, who treated Claimant, submitted a letter on

28  Claimant's behalf dated March 20, 2003, stating that she had been treating Claimant

1   intermittently since February 2001.  FNP Heron wrote that Claimant had been diagnosed with

2   Hepatitis C, anemia, hypothyroidism, hyperlipidemia, major chronic depression and anxiety,

3   cholelithiasis, and asthma, for which she currently was taking Levothyroxin, Effexor, Milk

4   Thistle, multivitamins, and using an Abluterol inhaler.  In the letter, it was noted that Claimant

5   had seen a gastroenterologist for treatment of the Hepatitis C, and the prospect of the treatment,

6   which usually increases depression, has exacerbated Claimant's anxiety and depression.  FNP

7   Heron added that Claimant's fatigue, anxiety, and depression, which she noted would become

8   worse with the treatment, combined with her symptoms from the cholelithiasis, Claimant has no

9   choice but to spend most of the day in bed.  FNP Heron opined that it would take one year for

10  Claimant to undergo treatment for both her Hepatitis C and cholelithiasis, while managing her

11  depression, before Claimant would be able to function again.  (AR 175-176).

12          On May 7, 2003, Dr. Shepard Fontaine, a DDS physician, reviewed Claimant's records

13  and assessed her physical RFC for her state reconsideration.  (AR 195-205).  Dr. Fontaine

14  determined that Claimant could occasionally (1) lift/carry twenty pounds; (2) frequently lift/carry

15  ten pounds; (3) stand, walk, and sit six hours in an eight hour day; and (4) had no pushing or

16  pulling limitations.  (AR 196). With respect to postural limitations, Claimant could occasionally

17  climb, balance, stoop, kneel, crouch, and crawl.  (AR 197).  Claimant had no manipulative,

18  visual, or communicative limitations.  (AR 198-199).  Dr. Fontaine noted that, because Claimant

19  had a history of asthma, she should avoid concentrated exposure to fumes, odors, gases, dusts,

20  and poor ventilation.  (AR 199).  He further reported that Claimant's symptoms were attributable

21  to medically determinable impairments, and the severity of the symptoms were supported by the

22  medical and non-medical evidence.  (AR 200).  Dr. Fontaine noted that Claimant's treating

23  doctor concluded that she was more limited than he reported, but believed that there was

24  substantial evidence supporting the modified light RFC.  (AR 201).  In his "chronological

25  discussion of evidence and issues involved," the Dr. Fontaine stated that Claimant's December

26  2002 denial found that she had a light RFC with postural limitations.  He reviewed the

27  additional medical records that Claimant submitted in support of her pending reconsideration,

28  including consulting examinations and treating FNP Heron's letter.  Dr. Fontaine discussed the

records in detail and concluded that Claimant's RFC had not changed.  (AR 202-05).

On September 3, 2003, Dr. Palmer signed a questionnaire that FNP Heron had answered on his behalf on August 14, 2003.  Dr. Palmer opined that Claimant's medical problems precluded her from performing any full-time job.  He stated that she suffered from chronic fatigue, severe depression, fibromyalgia, anemia, hypothyroidism, back and neck pain, and Hepatitis C, for which she would soon be undergoing treatment.  Dr. Palmer added that Claimant required frequent rest and could walk for only fifteen minutes due to her fatigue.  He further stated that she had been disabled since March 20, 2003, due to her depression, anxiety, and generalized malaise, which the treatment for her Hepatitis C would worsen.  (AR 221).

**Psychiatric Evaluation/RFC**

On April 6, 2003, David Mathis, DO, Board Eligible in psychiatry, performed an examining psychiatric evaluation of Claimant.  According to Claimant, she had intermittent problems with her mood since she was 15 years old, which had worsened since her mother's recent stroke.  Her symptoms included sadness, sleeping a lot, lack of energy, loss of interest in anything, and self-isolation.  Claimant reported that she started taking Effexor only because it was recommended that she do so before she began her interferon treatment.  Claimant admitted to a history of drug and alcohol abuse.  Dr. Mathis noted that Claimant watched television, cooked, did housework, shopped, handled money, and socialized with her family.  She disliked reading and had no hobbies.  Claimant stated that she always had been able to perform her jobs satisfactorily.  (AR 177-178).  With respect to Claimant's mental status, Dr. Mathis observed that she was well-groomed, cooperative, had coherent and organized thoughts although she stated that the interview made her anxious.  She functioned well intellectually and showed no lack of concentration, judgment, or memory.  (AR 178-179).  Claimant's mental health diagnoses were depressive disorder not otherwise specified and polysubstance dependence in remission. Dr. Mathis concluded that Claimant was capable of managing her own funds, performing simple and repetitive tasks and, with training, detailed and complex tasks, and interacting with coworkers and the public.  Overall, he opined that Claimant could work without interruptions or absences and deal with work-related stress.  (AR 179-180).

Based on the records, on May 5, 2003, a DDS physician concluded that Claimant's psychiatric impairments, which were limited to a depressive disorder not otherwise specified, were not severe.  (AR 181, 184).  The consultant determined that Claimant had no restrictions with respect to the activities of daily living, mild limitations as to social functioning and maintaining concentration, persistence, or pace, and found insufficient evidence to ascertain whether she suffered limiting episodes of decompensation.  (AR 191).

Clinical Psychologist Galyn Savage, Ph.D., submitted a psychological evaluation based on six therapy sessions that she had with Claimant between June 18, 2003 and August 27, 2003. Dr. Savage objectively noted that Claimant was irritable, intense, pessimistic, bitter, and had no goals or expectations other than to grow old in her apartment and watch her children grow up. The doctor further reported that Claimant appeared anxious and depressed, and lacked good insight or judgment.  In addition, Dr. Savage opined that Claimant lacked concentration. Claimant's test results indicated that she appeared to have a verbal learning disorder and was emotionally unpredictable, oscillating between contradictory feelings simultaneously.  Claimant also was rebellious, easily angered, and often disagreed with friends and family members, who saw her as self-centered and difficult.  She also had difficulty building relationships due to her suspiciousness about the motivations of others.  Overall, Dr. Savage reported that Claimant suffered from symptoms of depression and anxiety, and was unable to stop brooding about her tension, fearful presentiments, fatigue, and insomnia.  Her lack of coping skills made it difficult to ease her symptoms.  Dr. Savage's diagnoses included depressive disorder not otherwise specified, generalized anxiety disorder, personality disorder not otherwise specified with self-defeating and depressive traits, and moderate difficulty in social, occupation, and school functioning.  Dr. Savage concluded that Claimant was unhappy and isolated, with skewed perceptions about others due to her belief that she is being mistreated, and lacking the requisite skills to cope with or resolve problems.  (AR 298-301).

## STANDARD OF REVIEW

Congress has provided a limited scope of judicial review of a Commissioner's decision. 42 U.S.C. § 405(g).  A court must uphold the Commissioner's decision to deny benefits, made

16

through an ALJ, when the decision is based on the proper legal standards and is supported by

substantial evidence.  Webb v. Barnhart, 433 F.3d 683, 686 (9th Cir. 2005).  Substantial evidence

is more than a mere scintilla but less than a preponderance.  McAllister v. Sullivan, 888 F.2d

599, 601-602 (9th Cir. 1989) (quotations omitted).  It is "such relevant evidence as a reasonable

mind might accept as adequate to support a conclusion."  Webb, 433 F.3d at 686, citing

Richardson v. Perales, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427 (1971).  Moreover, such

"inferences and conclusions as the [Commissioner] may reasonably draw from the evidence" are

accorded the same consideration as is substantial evidence as defined above.  Mark v. Celebrezze,

348 F.2d 289, 293 (9th Cir. 1965).  On review, the court considers the record as a whole, not just

the evidence supporting the decision of the Commissioner.  Weetman v. Sullivan, 877 F.2d 20,

22 (9th Cir. 1989) (quotation and citation omitted).

It is the role of the trier of fact, not this Court, to resolve conflicts in evidence.

Richardson, 402 U.S. at 400, 91 S.Ct. at 1426-1427.  If the evidence supports more than one

rational interpretation, the court must uphold the decision of the ALJ.  Allen v. Heckler, 749 F.2d

577, 579 (9th Cir. 1984).  Moreover, if there is substantial evidence to support the administrative

findings, or if there is conflicting evidence that would support a finding of either disability or

non-disability, the Commissioner's decision is conclusive.  Sprague v. Bowen, 812 F.2d 1226,

1229-1230 (9th Cir. 1987).  Nevertheless, a decision supported by substantial evidence will be

set aside if the proper legal standards were not applied in weighing the evidence and making the

decision.  Brawner v. Secretary of Health and Human Services, 839 F.2d 432, 433 (9th Cir.

1987).

## RELEVANT LEGAL FRAMEWORK

To qualify as disabled under Title XVI of the Act, an applicant for SSI benefits must be

"unable to engage in any substantial gainful activity by reason of any medically determinable

physical or mental impairment which can be expected to result in death or which has lasted or

can be expected to last for a continuous period of not less than twelve months."  42 U.S.C.

§ 1382c(a)(3)(A).  The Act also provides that a claimant shall be determined to be under a

disability only if his impairments are of such severity that he "is not only unable to do his

previous work but cannot, considering his age, education, and work experience, engage in any other substantial gainful work which exists in the national economy."  42 U.S.C. § 1382c(a)(3)(B).

## SEQUENTIAL EVALUATION PROCESS

The Commissioner has established a five-step sequential evaluation process for determining whether a person is disabled under Title XVI of the Act.  20 C.F.R. § 416.920.  Step one determines if she is engaged in substantial gainful activities.  If she is, benefits are denied.  20 C.F.R. § 416.920(a)(4)(I), (b).  If she is not, the decision maker proceeds to step two, which determines whether claimant has a medically severe impairment or combination of impairments that meet the duration requirements set forth in 20 C.F.R. § 416.909; i.e. the impairment(s) are expected to result in death or continuously lasted or be expected to last at least twelve months.  20 C.F.R. § 416.920a(4)(ii), (c).  If the claimant does not have a severe impairment, a combination of impairments, or meet the duration requirement, the disability claim is denied. Id.

If the impairment is severe, the evaluation proceeds to the third step, which compares claimant's impairment with a number of listed impairments acknowledged by the Commissioner to be so severe as to preclude substantial gainful activity.  20 C.F.R. §§ 416.920(a)(4)(iii), (d); 20 C.F.R. § 404 Subpt. P App. 1.  If the impairment meets or equals one of the listed impairments and satisfies the duration requirement, claimant is conclusively presumed to be disabled.  20 C.F.R. §§ 416.909, 416.920(a)(4)(iii), (d).  If the impairment is not one conclusively presumed to be disabling, the evaluation proceeds to the fourth step, which determines whether the impairment prevents claimant from doing work performed in the past.  If the claimant is able to perform her previous work, she is not disabled.  20 C.F.R. §§ 416.920(a)(4)(iv), (e); 416.960(b).  If the claimant cannot perform this work, the fifth and final step in the process determines whether she is able to perform other work in the national economy in view of her age, education and work experience.  20 C.F.R. §§ 416.920(a)(4)(v), (f) and (g); 416.960(b) and (c).  See Bowen v. Yuckert, 482 U.S. 137 (1987).

The initial burden of proof rests upon a claimant to establish that she "is entitled to the benefits claimed under the Act."  Rhinehart v. Finch, 438 F.2d 920, 921 (9th Cir. 1971) (citations

1  omitted).  In terms of the five step sequential evaluation process, the Ninth Circuit has held that

2  "[t]he burden of proof is on the claimant as to steps one to four," while at the same time noting

3  that an ALJ's *affirmative duty* to assist a claimant to develop the record . . . complicates the

4  allocation of burdens" such that "the ALJ shares the burden at each step."  Tackett v. Apfel, 180

5  F.3d 1094, 1098 & n.3 (9th Cir. 1999) (italics in original).  The initial burden is met once a

6  claimant establishes that a physical or mental impairment prevents her from engaging in her

7  previous occupation.  The burden then shifts to the Commissioner to show (1) that the claimant

8  can perform other substantial gainful activity and (2) that a "significant number of jobs exist in

9  the national economy" which claimant can perform.  Kail v. Heckler, 722 F.2d 1496, 1498 (9th

10 Cir. 1984).

11                                  **ALJ'S FINDINGS**

12         The ALJ found at step one that Claimant "has not engaged in substantial gainful activity

13 since the alleged onset of disability."  (AR 27).  At step two, the ALJ determined that she did not

14 have a severe impairment, or combination of impairments, that met the duration requirements.

15 (AR 27).  Although the ALJ acknowledged that Claimant suffered from Hepatitis C, a thyroid

16 disorder, and fatigue, he concluded that, had she undergone the prescribed treatment for the

17 Hepatitis C, the related symptoms, which precluded her from working, would not exist and,

18 accordingly, her impairment would not have met the duration requirement.  (AR 18-19, 27).

19 Because, at step two, the ALJ found that Claimant did not have a severe impairment and did not

20 meet the duration requirement, he did not consider whether Claimant met  the step-three

21 requirements discussed above.  (See AR 27-28).

22         At step four, the ALJ found that Claimant had no past relevant work.  (AR 27).  At step

23 five, the ALJ found that Claimant was a younger individual with limited education.  (AR 27).

24 The ALJ also found that, were Claimant able to complete her recommended treatment for

25 Hepatitis C, "she would have the residual functional capacity to perform at least light work, with

26 the ability to lift and/or carry 20 pounds occasionally and 10 pounds frequently; to stand and/or

27 walk about 6 hours in an 8-hour workday; and to sit, with normal breaks, for a total of about 6

28 hours in an 8-hour workday."  (Id.).  As to her mental functioning, the ALJ found that "claimant

1  would have mild restrictions of activities of daily living, mild difficulties in maintaining social

2  functioning and mild deficiencies of concentration, persistence or pace." (Id.).  Additionally, the

3  ALJ found that Claimant's depression likely "is a direct result of her hepatitis C" that "would

4  resolve concommitant [sic] with treatment for her hepatitis C." (Id.).  He further noted that

5  Claimant had never had "an episode of decompensation of extended duration." (Id.).  Given

6  claimant's exertional capacity for light work, in combination with her age, education and work

7  experience, the ALJ held that a finding of "not disabled" was directed under Rule 202.17 of the

8  Medical-Vocational Guidelines ("the Grids"), 20 C.F.R. Pt. 404, Subpt. P, App. 2.  (AR 28).  The

9  ALJ, therefore, concluded that, because Claimant was not disabled under the Act, she was not

10  eligible for SSI.  (Id.).

11  **ISSUES**

12  In her opening brief, Claimant asserts that the Commissioner erred as a matter of law.

13  Claimant's allegations contend that:

14  (A)  The ALJ erred in denying benefits based upon Claimant's refusal to undergo treatment

15  for her Hepatitis C; and

16  (B)  The ALJ erred in discrediting the opinions of Claimant's treating physicians.

17  As discussed above, this Court must uphold the Commissioner's determination that

18  claimant is not disabled if the Commissioner applied the proper legal standards and there is

19  substantial evidence in the record as a whole to support the decision.

20  **DISCUSSION**

21  **A.   Claimant's failure to undergo treatment for her Hepatitis C**

22  Claimant first contends that the ALJ erred in denying her application for SSI benefits based

23  on her failure to undergo the Hepatitis C treatment that her treating physicians allegedly

24  prescribed.  Claimant further argues that the ALJ failed to fully develop the record regarding

25  whether Claimant's doctors recommended or prescribed the treatment.  (Doc. 15, pp. 3-4).  In

26  addition, Claimant alleges that she had legitimate reasons under the Social Security Regulations

27  for declining the treatment.  (Id. at p. 4).  The undersigned agrees in part and disagrees in part.

28  ///

**i.   Effect of failure to treat**

Social Security regulations applicable to Title XVI determinations specifically state that a claimant **must** follow **prescribed** treatment in order to get benefits:

> (a)  *What treatment you must follow*.  In order to get benefits, you must follow treatment prescribed by your physician if this treatment can restore your ability to work. . . .
> (b)  *When you do not follow prescribed treatment*.  If you do not follow the prescribed treatment without a good reason, we will not find you disabled . . . .

20 C.F.R. § 416.930(a),(b); Social Security Ruling ("SSR") 82-59, 1982 WL 31384 (1982) ("Program Policy Statement: Titles II and XVI: Failure to Follow Prescribed Treatment"); Warre v. Commissioner of Social Security, 439 F.3d 1001, 1006 (9th Cir. 2006) ("[i]mpairments that can be controlled effectively with medication are not disabling for the purpose of determining eligibility for SSI benefits").  Examples of "good reasons" for failure to treat are set forth in the regulations as well:

> The following are examples of a good reason for not following treatment:
>
> (1)  The specific medical treatment is contrary to the established teaching and tenets of your religion.
>
> (2) The prescribed treatment would be cataract surgery for one eye, when there is an impairment of the other eye resulting in a severe loss of vision and is not subject to improvement through treatment.
>
> (3) Surgery was previously performed with unsuccessful results and the same surgery is again being recommended for the same impairment.
>
> (4) The treatment because of its enormity (e.g. open heart surgery), unusual nature (e.g., organ transplant), or other reason is very risky for you; or
>
> (5) The treatment involves amputation of an extremity, or a major part of an extremity.

20 C.F.R. § 416.930(c).  See SSR 82-59, 1982 WL 31384, * 3-4 ("justifiable cause" to refuse treatment exists when: (1) where treatment would be contrary to a claimant's religion, (2) where cataract extraction is required but where vision in the remaining eye is severely impaired, (3) where claimant is unable to afford the prescribed treatment, (4) where treating medical source advises against the treatment; (5) where prior surgery for the same impairment was performed with unsuccessful results; (6) where the treatment carries a high degree of risk because of the enormity of the procedure, such as an organ transplant or open heart surgery); (7) where the

treatment requires amputation of an extremity; and (8) where fear of surgery is so "intense and unrelenting that it is, in effect, a contraindication to surgery").

Moreover, while it is up to a treating physician to prescribe a course of treatment (such as interferon for Hepatitis C), the ultimate determination as whether such treatment can be expected to restore a claimant's ability to work is for the Commissioner to decide: "[T]he judgment as to whether prescribed treatment can be expected to restore ability to work will be made by SSA." SSR 82-59, 1982 WL 31384, *2.  In addition, when there has been a failure to treat, a claimant must be "given an opportunity to fully express the specific reason(s) for not following the prescribed treatment.  Detailed questioning may be needed to identify and clarify the essential factors of refusal." Id., 1982 WL 31384, *2.

Here, and as noted in the Statement of Facts, supra, that questioning was performed by ALJ Baker:

| ALJ: | Has that [hepatitis C treatment program] every been rescheduled or anything of that ilk? |
| Claimant: | No. |
| ALJ: | Why not? |
| Claimant: | Truthfully, Your Honor, I'm really afraid of doing this interferon, and I know I have to do it. |
| ALJ: | Well, what have the doctors told you? |
| Claimant: | They said the type that I have, hepatitis C, responds to it, to the interferon and I have to give myself my own injections, and I just -- |
| ALJ: | More important, what have the doctors told you if you don't undergo the treatment? |
| Claimant: | That it could get worse to where the treatment won't help me. |
| ALJ: | So you're aware then that if you don't undergo the treatment, you're going down a real slippery slope.  You understand that? |
| Claimant: | Yeah, I do. |

. . .

| ALJ: | And I assume the doctors told you that this interferon ribavarin, which is the current approach to this particular disease, is pretty uncomfortable, but I'm also sure they told you that it's not as uncomfortable as what could happen if you don't undergo the treatment. |

1   Claimant:        Right.

2   ALJ:             Is that correct?

3   Claimant:        Yeah.

4   (AR 41-42).  In addition to the foregoing testimony, ALJ Baker also accurately reported

5   Claimant's statement when seen at Greenley Primary Care Center on July 15, 2003, that she "will

6   not have hep C RX til has SSI in place."  (AR 22, 231).

7       Given the foregoing, assuming that the interferon treatment was prescribed by Claimant's

8   treating physicians, substantial evidence supports ALJ Baker's determination that Claimant's

9   failure to undergo the Hepatitis C treatment "does not meet any of the noted exceptions listed

10  under Social Security Ruling 82-59," and further that claimant "is clearly aware of the

11  consequences of her failure to follow the prescribed treatment."  (AR 25).  The ALJ therefore did

12  not err.  See Ukolov v. Barnhart, 420 F.3d 1002, 1004 (9th Cir. 2005) ("'[w]e may set aside a

13  denial of benefits only if it is not supported by substantial evidence or if it is based on legal

14  error'") (quoting Thomas v. Barnhart, 278 F.3d 947, 954 (9th Cir. 2002)).

15      **ii.  Failure to develop the record**

16      In a Social Security case, an ALJ is obligated to fully and fairly develop the record even if

17  the claimant is represented by counsel.  Celaya v. Halter, 332 F.3d 1177, 1183 (9th Cir. 2003).

18  This duty may require that the ALJ obtain additional information by, inter alia, contacting

19  treating physicians, scheduling consultative examinations, or calling a medical expert.  See 20

20  C.F.R. §§ 416.912(e)-(f), 416.919a; Armstrong v. Commissioner , 160 F.3d 587, 590 (9th Cir.

21  1998).  The claimant, however, must furnish medical evidence about his alleged disabling

22  impairments.  See 20 C.F.R §§ 416.912(a)-(c) (it is claimant's obligation to furnish medical

23  evidence about his alleged impairments).  The ALJ, however, is not obligated to develop an

24  existing record that is unambiguous, complete, and adequate such that he properly can evaluate

25  the evidence.  See Mayes v. Massanari, 276 F.3d 453, 459-460 (9th Cir. 2001) ("An ALJ's duty

26  to develop the record further is triggered only when there is ambiguous evidence or when the

27  record is inadequate to allow for proper evaluation of the evidence.").

28  ///

In the instant case, because the medical records are incomplete and do not provide

sufficient evidence as to whether Claimant's treating physicians actually prescribed that she

undergo the interferon treatment, the ALJ was obligated to contact her doctors to fully develop

the record so that he could ascertain whether  the treatment actually was prescribed or merely

recommended.  20 C.F.R. §§ 416.912(e)-(f), 416.919a; Celaya, 332 F.3d at 1183; Armstrong,

160 F.3d at 590.  The records upon which the ALJ relied recommend and/or urge the Hepatitis C,

but nowhere prescribe it.  (See Claimant's Medical Records, supra).

**B.**    **Treating Physician Opinions**

Claimant's only other alleged errors on appeal are that the ALJ improperly discounted the

opinions of treating physicians R. Byron Palmer, M.D. and Galyn Savage, Ph.D.  (Doc. 15, pp. 4-

5).  Assuming, arguendo, that the interferon treatment was prescribed by Claimant's treating

physicians, the undersigned finds no error.

**i.**    **Failure to treat**

As noted above, "[i]ndividuals with a disabling impairment which is amenable to treatment

that could be expected to restore their ability to work must follow the **prescribed** treatment to be

found under a disability, unless there is a justifiable cause for the failure to follow such

treatment."  SSR 82-59, 1982 WL 31384, *1 (emphasis added).  Moreover, while it is up to a

treating physician to prescribe a course of treatment (such as interferon for Hepatitis C), the

ultimate determination as to whether such treatment can be expected to restore a claimant's

ability to work is for the Commissioner to decide: "[T]he judgment as to whether **prescribed**

treatment can be expected to restore ability to work will be made by SSA."  SSR 82-59, 1982

WL 31384, *2 (emphasis added).

Adhering to the strictures of 20 C.F.R. § 416.930 and SSR 82-59, ALJ Baker found that the

opinions of Claimant's physicians, including Dr. Palmer and including any assessments as to her

depression and anxiety (such as by Galyn Savage, Ph.D.), were reflective of a treatable - but

intentionally untreated - disease:

> The undersigned notes that the opinions of record pertaining to the claimant's
> inability to work, including those by Dr. Palmer, are based on the claimant's
> symptomatology relating to hepatitis C.  The claimant has repeatedly been

reported to have fatigue, depression and anxiety relating to hepatitis C. However, despite the **recommendations** to the claimant by treating medical doctors and nurses that she should undergo pegylated interferon and ribavirin treatment, she has consistently refused such treatment. In fact, in July 2003, the claimant revealed that she would not undergo hepatitis C treatment until she had her Social Security Income benefits in place (Exhibit 11F/10). Because claimant's basis for her failure to follow **prescribed** treatment does not meet any of the noted exceptions listed under Social Security Ruling 82-59, and she is clearly aware of the consequences of her failure to follow the **prescribed** treatment, such failure is not justifiable. The claimant's physical and mental symptomatology would be expected to improve greatly with the recommended treatment. Consequently, because the claimant has not followed such treatment, she does not have a severe disorder due to hepatitis C, as the durational requirements pursuant to the Regulations are not met. Social Security Ruling 82-59 (emphasis added).

. . .

[A]ny alleged depression is a direct result of her hepatitis C and, more likely than not, would resolve concomitant [sic] with treatment for her hepatitis C. (AR 25, 27).

Upon this basis alone, ALJ Baker properly discounted the opinions of Drs. Palmers and Savage, since both opined about Claimant's condition while she remained untreated for Hepatitis C. Brown v. Barnhart, 390 F.3d 535, 541 (8th Cir. 2004) (opinion of treating physician properly discounted when claimant was non-complaint with prescribed treatment) (*cited in support of general proposition for requirement to treat by* Warre v. Commissioner of Social Security, 439 F.3d 1001, 1006 (9th Cir. 2006)). Because, however, it has not been established that the Hepatitis C treatment was prescribed rather than recommended, the undersigned cannot determine whether the ALJ's decision with respect to this allegation is appropriate or not.

## ii. **Other grounds**

In addition to noting claimant's failure to treat, the ALJ stated other grounds for discounting the opinions of Drs. Palmer and Savage. Before addressing these grounds, it bears noting that the courts distinguish among the opinions of three types of physicians: treating physicians, physicians who examine but do not treat the claimant ("examining physicians") and those who neither examine nor treat the claimant ("nonexamining physicians"). Lester v. Chater, 81 F.3d 821, 830 (9th Cir. 1996). As a general rule, a treating physician's opinion is given special weight because of his or her familiarity with a claimant's physical condition. Id.; Fair v. Bowen, 885 F.2d 597, 604-605 (9th Cir. 1989); see also Smolen v. Chater, 80 F. 3d 1273, 1285

1  (9th Cir. 1996) ("Because treating physicians are employed to cure and thus have a greater

2  opportunity to know and observe the patient as an individual, their opinions are given greater

3  weight than the opinions of other physicians"); Social Security Ruling 96-2p, 1996 WL 374188,

4  *1 (July 2, 1996) (the opinions of a treating physician ordinarily should be given great weight).

5       Regardless of the weight given to a treating physician's medical opinion, it is not binding

6  on the ALJ with respect to the ultimate determination of disability.  See Batson v. Commissioner

7  of Social Security Administration, 359 F.3d 1190, 1194-1195 (9th Cir. 2004) (treating physician

8  had opined that claimant "met or equaled the criteria" for a listed impairment under 20 C.F.R.

9  §  404 Subpt. P App. 1, § 105C); Magallanes v. Bowen, 881 F. 2d 747, 751 (9th Cir. 1989)

10  ("treating physician's opinion is not, however, necessarily conclusive as to either a physical

11  condition or the ultimate issue of disability").  Accordingly, although entitled to great weight, a

12  treating physician's opinion is not conclusive and may be rejected by the ALJ under appropriate

13  circumstances.  Where a treating physician's opinion is not contradicted by another physician, it

14  may be rejected by the ALJ only for clear and convincing reasons supported by substantial

15  evidence in the record.  Reddick v. Chater, 157 F.3d 715, 725 (9th Cir. 1998) (quotations and

16  citations omitted).  If a treating physician's opinion is contradicted by another physician, the ALJ

17  may reject the treating physician's opinion only by providing specific and legitimate reasons'

18  supported by substantial evidence in the record for so doing."  Id. (quotations and citations

19  omitted).  The same test applies to examining physicians:  the ALJ must give clear and

20  convincing reasons for rejecting uncontradicted opinions, or "specific and legitimate reasons

21  supported by substantial evidence in the record" for rejecting those opinions that have been

22  contradicted.  Lester, 81 F.3d 821, 830-831.

23       Courts within the Ninth Circuit have recognized various reasons deemed sufficient for the

24  ALJ to disregard a treating or examining physician's opinion.  These reasons include:  conflicting

25  medical evidence, the absence of regular medical treatment during the alleged period of

26  disability, and the lack of medical support for physicians' reports that are based substantially on

27  the claimant's subjective complaints of pain.  Flaten v. Secretary of Health & Human Svcs., 44

28  F.3d at 1453, 1463-1464; Fair, 885 F.2d at 604.  The ALJ also may disregard a physician's

opinion that is "brief and conclusionary in form with little in the way of clinical findings to support [its] conclusion." <u>Magallanes</u>, 881 F.2d at 751 (citations omitted).  In contrast, vague, broad or generalized reasons are insufficient grounds for the ALJ to reject a treating physician's opinion.  <u>McAllister v. Sullivan</u>, 888 F.2d 599, 602 (9th Cir. 1989).

**(a) <u>R. Byron Palmer, M.D.</u>**

One a one-page questionnaire prepared and signed by Candace Heron, FNP, but also signed by R. Byron Palmer, M.D., it is stated that claimant suffers from "chronic fatigue hepatitis C - (treatment pending)."  (AR 221).  Additional impairments were listed as "severe depression, fibromyalgia, anemia, hypothyroidism, R/O fibromyalgia, back & neck pain (MRI pending)." (<u>Id.</u>)  Addressing Claimant's exertional capacity, the questionnaire stated that Claimant could not sit at all and could stand/walk for 15 to 20 minutes at a time due to fatigue.  (<u>Id.</u>)  Finally, the questionnaire opined that Claimant's "depression & anxiety and generalized malaise preclude [her] from any gainful employment.  The hepatitis treatment typically worsens these symptoms." (<u>Id.</u>)

In his written determination, ALJ Baker cited several reasons for discounting the above-referenced opinions.  First, the ALJ noted that the questionnaire intruded upon the province of the Commissioner in opining that certain of Claimant's impairments (<u>e.g.</u>, depression and anxiety) "preclude[d] . . . any gainful employment."  (AR 24).  Discounting this assessment, the ALJ correctly cited Social Security Ruling 96-5p, 1996 WL 374183, *5 (Jul. 2, 1996), which directs that such ultimate determinations have no controlling weight or special significance:

> Medical sources often offer opinions about whether an individual who has applied for title II or title XVI disability benefits is "disabled" or "unable to work," or make similar statements of opinions. . . . Because these are administrative findings that may determine whether an individual is disabled, they are reserved to the Commissioner.  Such opinions on these issue may not be disregarded.  However, even when offered by a treating source, they can never be entitled to controlling weight or given special significance.

A second reason cited by the ALJ for discounting the mental health assessment set forth in the questionnaire was that it was contradicted the opinion of "a board eligible psychiatrist," David Mathis, D.O.  (AR 24, 177-180).  This, too, was a legitimate ground upon which to discount the opinion set forth in the questionnaire.  As stated in 20 C.F.R. § 416.927(d)(5):

1      *Specialization*. We generally give more weight to the opinion of a specialist about
       medical issues related to his or her area of specialty than to the opinion of a source
2      who is not a specialist.

3          Finally, ALJ Baker noted that the exertional capacity limitations set forth in the

4      questionnaire (e.g., Claimant's ability to stand and walk) were inconsistent with several Physical

5      Residual Functional Capacity Assessments performed by state agency physicians. (AR 24, 128-

6      34, 195-202). In addition, of particular significance here is that Claimant's ability to stand and

7      walk was, according to the questionnaire, limited only by reason of "fatigue." (AR 221). Given

8      that such fatigue was, according to the questionnaire itself, related to Claimant's Hepatitis C

9      (AR 221), and given that Claimant refused treatment for the disease, assuming that the interferon

10     treatment had been prescribed, ALJ Baker correctly referenced Claimant's failure to treat as an

11     additional ground for discounting the opinion elsewhere in his written determination. (AR 25).

12     See Brown v. Barnhart, 390 F.3d 535, 541 (8th Cir. 2004) (opinion of treating physician properly

13     disc F. 3d 1001ounted when claimant was non-compliant with prescribed treatment) (*cited in*

14     *support of general proposition for requirement to treat by* Warre v. Commissioner of Social

15     Security, 439 F.3d 1001, 1006 (9th Cir. 2006)).

16     **(b) Galyn Savage, Ph.D.****

17         ALJ Baker stated the following grounds for discounting the opinion of Galyn Savage,

18     Ph.D.:

19         In September 2003, Galyn Savage, Ph.D., reported that the claimant complained
           of depression, isolation, mood swings, problems maintaining friendships, the
20         inability to work, low self-esteem, fatigue, and lack of motivation and energy.
           She was noted to have been clean and sober since 1998. The claimant revealed
21         that she was unsure if she wanted to go on interferon. Dr. Savage assessed her
           with depressive disorder, not otherwise specified, generalized anxiety disorder,
22         and polysubstance abuse, in sustained remission. Her Global Assessment of
           Functioning Scale score was noted to be 55, which suggested moderate difficulty
23         in social or occupational functioning pursuant to the Diagnostic and Statistical
           Manual-IV. Dr. Savage opined that the claimant's interpersonal relationships
24         were chronically problematic for her and that she lacked the problem solving
           skills necessary to remedy these issues. Her perceptions about others were noted
25         often to be skewed by her willingness to believe that she was being slighted or
           otherwise mistreated. (Exhibit 12F/9-12).
26
           The undersigned gives less weight to Dr. Savage's determinations as they are not
27         consistent with the objective medical evidence of record, including the findings by
           a board eligible psychiatrist (Exhibit 6F/4) and a medical consultant employed by
28         the state, which found that the claimant had no restrictions of activities of daily

living, only mild difficulties in maintaining social functioning, and mild
deficiencies of concentration, persistence or pace (Exhibit 7F/11).

(AR 24-25).

As is evident from the above quoted text, ALJ Baker found Dr. Savage's opinion to be
contradicted by an examining physician – Board-Eligible psychiatrist David Mathis, D.O.  (AR
25, 177-180), and by a state agency non-examining medical consultant (AR 25, 191), both of
whom noted only mild or no mental impairments.  (AR 177-180, 191).  Although Dr. Savage's
was not a medical doctor, and her assessment was inconsistent with other medical opinions cited
by the ALJ, Dr. Savage had seen Claimant six times before preparing her September 2003 report.
(AR 298-301).  Two key factors in evaluating opinion evidence are (1) the duration of the
treatment relationship and (2) the consistency of an opinion with the record as a whole.  20
C.F.R. § 416.927(d).  Given the absence of medical or psychiatric records supporting
psychologist Savage's assessment, including any indication that Claimant regular saw a therapist,
the undersigned concludes that the ALJ did not err in finding that Dr. Mathis's report, after he
examined Claimant, was consistent with the overall record, including Claimant's statements
regarding her daily activities.

## CONCLUSION AND RECOMMENDATION

For the reasons outlined above, the undersigned concludes that the Commissioner's
decision to deny Claimant SSI benefits was not supported by substantial evidence in the record
and was not based upon the proper legal standards.

Accordingly, it IS RECOMMENDED that

1.      Claimant's Social Security complaint BE GRANTED, and

2.      The matter BE REMANDED, pursuant to sentence four of 42 U.S.C. § 405(g), for
development of the record and further consideration, consistent with this decision, of Claimant's
eligibility for SSI benefits, including whether Claimant's interferon treatments were prescribed or
merely recommended; and

3.      Judgment BE ENTERED for Claimant Kim Lowers and against Michael Astrue.

///

1    This Report and Recommendation is submitted to the District Judge assigned to this

2  action, pursuant to 28 U.S.C. § 636(b)(1)(B) and this Court's Local Rule 72-304.  No later than

3  eleven (11) days after service of this Report and Recommendation, any party may file written

4  objections to this Report and Recommendation with the Court and serve a copy on all parties and

5  the Magistrate Judge and otherwise in compliance with this Court's Local Rule 72-304(b).  Such

6  a document should be captioned "Objections to Magistrate Judge's Report and

7  Recommendation."  Responses to objections shall be filed and served no later than eleven (11)

8  days after service of the objections and otherwise in compliance with this Court's Local Rule 72-

9  304(d).  A copy of the responses shall be served on the Magistrate Judge.  The District Judge will

10  review the Report and Recommendation, pursuant to 28 U.S.C. § 636(b)(1)(C).  The parties are

11  advised that failure to file objections within the specified time may waive the right to appeal the

12  District Judge's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

13

14  IT IS SO ORDERED.

15  Dated:   **March 1, 2007**                                    _____**/s/ Theresa A. Goldner**_____
    **j6eb3d**                                                    UNITED STATES MAGISTRATE JUDGE
16

17

18

19

20

21

22

23

24

25

26

27

28